**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| **Plaintiff**, | § | |
| **v.** | § | **JURY TRIAL DEMAND** |
| | § | **Case No.: 5:26-cv-7274** |
| **JOSE A. GAMEZ,** | § | |
| **Defendant.** | § | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "Plaintiff") for its Complaint against Defendant Jose A. Gamez ("Gamez") alleges as follows:

## SUMMARY

1. From approximately April 2020 through June 2025, Gamez perpetrated a fraudulent investment scheme in which he misappropriated approximately $1.46 million from four elderly clients while serving as their investment adviser representative and/or registered representative. Gamez was associated with a large financial institution that was dually-registered with the Commission as a broker-dealer and investment adviser ("Financial Institution A"). Gamez was also employed by a federally insured credit union ("Financial Institution B"), which offered investment services to its members through Financial Institution A.

2. Gamez induced the four elderly clients to liquidate securities, make cash withdrawals, and invest the proceeds with First Capital Investment Services LLC ("First Capital"), a non-registered entity he controlled. Gamez promised the clients higher returns than they were earning in

their current investments, and he told them that First Capital would manage their money by investing in real estate investment trusts ("REITs"), certificates of deposit ("CDs"), equities, or other securities. Instead, Gamez misappropriated the money for personal use, including gambling at casinos. Gamez further concealed his fraud by providing clients fabricated First Capital account statements reflecting fictitious gains when, in reality, their funds had already been misappropriated.

3. Through his actions, Gamez has violated, and unless enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and (2)]. The Commission brings this action against Gamez seeking: (i) permanent injunctive relief; (ii) disgorgement of ill-gotten gains plus prejudgment interest; and (iii) a civil penalty.

## DEFENDANT

4. Gamez resides in San Antonio, Texas. At all relevant times, Gamez was an investment adviser representative and registered representative associated with Financial Institution A, and employed at Financial Institution B. During the relevant period, Gamez had control over First Capital as its sole proprietor.

## JURISDICTION AND VENUE

5. The Commission brings this action pursuant to authority conferred upon it by Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] and Sections 209(d) and 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(d) and 80b-9(e)].

6. Venue in this District is proper and this Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa]

and Sections 209(d), 209(e), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), and 80b-14].

7. Defendant transacted business in this District, and a substantial part of the acts, practices, transactions, and courses of business alleged in this Complaint giving rise to the Commission's claims occurred within this District. During the relevant time period, the clients defrauded by Gamez were located in this District. Further, Gamez resides in San Antonio, Texas, which is located within this District.

## FACTUAL ALLEGATIONS

### A. Defendant Gamez

8. Gamez has worked as a registered representative and investment adviser for many years. Gamez became associated with Financial Institution A as an investment adviser representative and registered representative in 2017. At the same time, Gamez worked as an employee of a credit union, Financial Institution B, where he was responsible for marketing securities distributed through Financial Institution A.

9. While associated with Financial Institution A, Gamez provided investment advice to clients for compensation. Gamez was engaged in the business of advising clients as to the advisability of investing in, purchasing, or selling securities, including when he recommended the securities investments described below.

10. Financial Institution A discovered Gamez's misconduct in June 2025, leading Financial Institution A to terminate his association as an investment adviser representative and registered representative, and Financial Institution B to terminate his employment at the credit union.

11. During the relevant period, Gamez also controlled First Capital. Upon information and belief, First Capital is the assumed name of an unregistered limited liability company, and

Gamez is its sole proprietor.

**B. Gamez Misappropriated Funds of Client A**

12. Since at least May 2018, an elderly client ("Client A") maintained an investment advisory relationship with Financial Institution A. She first met Gamez after she asked to speak with a financial advisor at an unrelated financial institution. Gamez managed her investments at that institution, and later managed her investments after he became associated with Financial Institution A. Client A maintained multiple investment accounts at Financial Institution A, including a brokerage account, a traditional Individual Retirement Account ("IRA"), and a Roth IRA.

13. Gamez recommended that Client A place funds with First Capital and represented that he would select investments that would make money for her. Among other things, he told Client A that she could buy shares in another company and earn money from that investment. Client A relied on Gamez to manage her investments and followed his recommendations. At Gamez's direction, she obtained cashier's checks payable to First Capital, which he picked up at her home. Instead of investing the proceeds for her benefit, Gamez deposited the checks into the First Capital bank account that he controlled at Financial Institution B and transferred funds from that account to his personal accounts.

14. For example, on or about April 13, 2020, Client A obtained a cashier's check in the amount of $20,000, which was payable to First Capital. She provided the check to Gamez, and he deposited it into First Capital's bank account on or about April 15, 2020. At the time Gamez made the deposit into First Capital's bank account, he maintained a balance of $5 in the account. Gamez then made a series of transfers and withdrawals between $500 and $4,000 over the next two months, thereby misappropriating Client A's funds.

15. Gamez, on behalf of Client A, sold securities in her account at Financial Institution A to fund Client A's purported investments with First Capital. For example, on or about February 14, 2022, Gamez sold approximately $10,000 in equities in Client A's account at Financial Institution A and initiated a $10,000 ACH withdrawal of the sale proceeds. On the following day, Gamez withdrew an additional $25,000 from her account. On or about February 16, 2022, Client A obtained a $45,000 cashier's check payable to First Capital, using in part the money withdrawn from her account with Financial Institution A. Gamez deposited the check into the First Capital bank account and transferred the money from that account to his personal accounts that same day.

16. In total, between April 2020 and October 2024, Gamez obtained seven cashier's checks from Client A totaling $220,000. These included additional checks for $50,000 on or about August 2, 2023, and $50,000 on or about October 30, 2024. Gamez used the First Capital bank account to receive Client A's money and then made cash withdrawals and transfers to his personal account, rather than investing the funds as he had represented.

17. Gamez concealed his fraud from Client A by telling her that her investments were doing well and making money. When Client A's family requested documents concerning her investments, Gamez emailed fabricated account statements purporting to reflect her investments with First Capital. Gamez knew these statements were false because he had diverted Client A's money for his own use instead of investing them as he had represented.

**C. Gamez Misappropriated Funds of Client B**

18. A second elderly client ("Client B") opened an investment advisory account with Financial Institution A in late 2021 after meeting Gamez at Financial Institution B. Gamez managed her retirement and other investment accounts and advised her concerning the

movement of her money into investments. Between July 2022 and March 2025, Gamez obtained 17 cashier's checks from Client B totaling $667,500, which were deposited into the First Capital bank account that he controlled.

19. For example, in June 2024, Gamez called Client B and recommended that she move cash from her account with Financial Institution A into purported CD through First Capital. Gamez represented that these CDs paid interest of 9.5% or 8.5% and carried no risk other than the possibility that the issuing bank would redeem them before maturity. He told Client B that the investments were outside Financial Institution A but did not disclose that he controlled First Capital. Rather than using Client B's money to purchase the CDs he had recommended, Gamez diverted Client B's money for his own use.

20. Gamez, on behalf of Client B, sold securities in her account at Financial Institution A to fund Client B's purported investments with First Capital. For example, on or about December 5, 2024, Gamez sold equities in Client B's account with Financial Institution A for $59,997.01 and initiated a $60,000 withdrawal from her account on the same day. Client B provided a $60,000 cashier's check dated December 5, 2024, to Gamez for the purported First Capital investment. On or about December 6, 2024, Gamez deposited the check into the First Capital bank account and transferred $50,000 from that account to his personal account that same day.

21. Similarly, on or about February 13, 2025, Gamez sold CDs in Client B's account at Financial Institution A, generating $50,475.78 in available cash in the account. Following a $50,000 withdrawal from that account on or about February 14, 2025, Client B provided Gamez a $50,000 cashier's check dated February 18, 2025, payable to First Capital. Gamez deposited the check on or about February 19, 2025, and transferred $40,000 from the First Capital bank

account to his personal account that same day.

**D. Gamez Misappropriated Funds of Client C**

22. Gamez also misappropriated money from a third elderly investment advisory client ("Client C") whom he advised at Financial Institution A. Between March 2022 and June 2025, Gamez obtained 11 cashier's checks from Client C totaling $535,000, which were deposited into the First Capital bank account that he controlled. These deposits included proceeds from sales of stocks and bonds in Client C's account at Financial Institution A. Rather than investing the money through First Capital as represented, Gamez made cash withdrawals and transferred the money to his personal accounts.

23. Gamez, on behalf of Client C, sold securities in Client C's account at Financial Institution A to fund Client C's purported investments with First Capital. For example, on or about May 13 and May 16, 2022, Gamez sold stocks and bonds in Client C's account at Financial Institution A and initiated a $45,000 withdrawal from Client C's account on or about May 16, 2022. On or about May 20, 2022, Client C obtained a $45,000 cashier's check made payable to First Capital. Gamez deposited the check into the First Capital bank account. On the day of the deposit, Gamez made cash withdrawals and transferred the money from that account to his personal account, rather than investing the money for Client C.

24. Similarly, on or about August 20, 2024, Gamez sold stock in Client C's account at Financial Institution A for $87,273.91 and initiated a $75,000 withdrawal from Client C's account. On or about August 22, 2024, Client C provided a $75,000 cashier's check made payable to First Capital. Gamez deposited the check into the First Capital bank account and transferred money from that account to his personal account that same day. Gamez thereby used the sale of securities in Client C's account to obtain money for his own benefit instead of

the investments he had represented would be made for Client C.

**E. Gamez Misappropriated Funds of Client D**

25. Another elderly client ("Client D") had relied on Gamez for investment advice before she became associated with Financial Institution A and followed him to that firm. Gamez advised Client D concerning her investments, including her Roth IRA and other investment accounts, recommended changes to her investments, and referred to her accounts as managed accounts. In June 2022, after Client D received $20,000 from a prior REIT investment, Gamez recommended that she invest in another REIT through First Capital. He falsely told her that another client had brought First Capital to his attention and that it offered great returns. He did not disclose that he controlled First Capital.

26. In reliance on Gamez's recommendations, Client D provided two cashier's checks payable to First Capital, each for $20,000, dated June 14, 2022, and July 1, 2022. Gamez picked up the checks at Client D's home. To supply the proceeds for the second check, on or about June 28 and June 29, 2022, Gamez, on behalf of Client D, sold mutual funds in Client D's account at Financial Institution A and initiated a $40,000 withdrawal from her account on or about June 30, 2022. Gamez misappropriated the $40,000 by depositing both checks into the First Capital bank account, withdrawing cash, and transferring the money to his personal account, rather than purchasing REIT interests for Client D.

27. As with Client A, Gamez concealed his fraud from Client D by providing a fabricated account statement purporting to reflect her First Capital investment. Gamez sent a statement from his email account at Financial Institution A which purported to show an investment value of $48,241.23, even though he had misappropriated her money. When Client D asked about the status of her investment, Gamez told her that these investments take years

and that she should be patient. He also directed her to contact him by text message on his personal telephone rather than his Financial Institution A telephone number.

**F. Gamez Uses Misappropriated Money To Support His Lifestyle**

28. Gamez used the money that he misappropriated from his clients to support his lifestyle, which included cash withdrawals to pay for his gambling at multiple casinos and other personal expenses.

29. In total, between April 2020 and June 2025, Gamez misappropriated approximately $1.46 million from Clients A, B, C, and D. As an investment adviser, Gamez owed his advisory clients an affirmative fiduciary duty of utmost good faith. In violation of that duty, Gamez used their investment money for his own benefit, made false statements concerning their purported investments, and concealed his diversion of their money. Gamez knew that the money he obtained for purported investments had instead been transferred to accounts he controlled and withdrawn for his benefit, not invested as he had represented to his clients.

## FIRST CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

30. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 29.

31. By engaging in the acts and conduct alleged herein, and as alleged in paragraphs 1-2 and 8-29 above, Gamez, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or with severe recklessness has:

(a) employed one or more devices, schemes or artifices to defraud;

(b) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

32. By reason of the foregoing, Gamez, directly or indirectly, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Violations of Sections 206(1) and 206(2) of the Advisers Act
### [15 U.S.C. §§ 80b-6(1) and (2)]

33. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 29.

34. At all relevant times, Gamez was an investment adviser under Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

35. By engaging in the acts and conduct alleged herein, and as alleged in paragraphs 1-2 and 8-29 above, Gamez, by use of the mails or any means or instrumentalities of interstate commerce, directly or indirectly has:

(a) knowingly or with severe recklessness employed one or more devices, schemes, or artifices to defraud any client or prospective client; and

(b) knowingly, with severe recklessness, or negligently engaged in one or more transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon any client or prospective client.

36. By reason of the foregoing, Gamez, directly or indirectly, has violated and,

unless enjoined, will continue to violate Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

A. Permanently enjoining and restraining Gamez from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)];

B. Permanently enjoining and restraining Gamez from directly or indirectly acting as or being associated with any broker, dealer, or investment adviser. For purposes of this paragraph: (i) a person is associated with a broker or dealer if such person is a partner, officer, director, or branch manager of such broker or dealer (or occupies a similar status or performs similar functions), directly or indirectly controls, is controlled by, or is under common control with such broker or dealer, or is an employee of such broker or dealer; and (ii) a person is associated with an investment adviser if such person is a partner, officer, or director of such investment adviser (or performs similar functions), or directly or indirectly controls or is controlled by such investment adviser, including any employee of such investment adviser;

C. Ordering Gamez to disgorge all ill-gotten gains he received as a result of the violations alleged herein, together with prejudgment interest on those amounts, pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5);

D. Ordering Gamez to pay a civil penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9] for violations of the federal securities laws as alleged herein; and

E. Imposing such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMAND**

The SEC demands a trial by jury on all issues that may be so tried.

Dated: November 20, 2026

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

*/s/ Keefe Bernstein*

Keefe Bernstein
Texas Bar No. 24006839
Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX 76102
Telephone: 817-900-2607
Email: bernsteink@sec.gov

*Attorney for Plaintiff*